IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division



ST. PAUL FIRE & MARINE INSURANCE COMPANY,

      Plaintiff,

v.                           Civil Action No. 1:04cv1303

WITTMAN MECHANICAL CONTRACTORS, INC.,

      Defendant.

## OPINION AND ORDER

On the morning of January 12, 2004, defendant Wittman Mechanical Contractors, Inc. ("Wittman Mechanical") activated the propane gas line leading to a house under construction in Loudon County, Virginia and started a furnace located therein. A gas explosion destroyed the house approximately one hour later. Plaintiff St. Paul Fire & Marine Insurance Company ("St. Paul") paid the claim submitted by the home owner and filed this subrogation action against Wittman Mechanical, alleging negligence and breach of warranty.

After a three-day trial, a jury found in favor of Wittman Mechanical on both claims. St. Paul now moves for judgment as a matter of law pursuant to Fed. R. Civ. P. 50. For the reasons stated below, the Court **GRANTS** plaintiff's motion.

## I.   Factual and Procedural History[1]

### A.   Construction of the House

The builder/owner of the house that exploded was Virginia Residential Construction, Inc., also known as The Van Metre Company (hereinafter collectively referred to as "VRC").  VRC is a major residential real estate developer in the Washington, D.C. metropolitan area.  The destroyed house, which was located in a development known as Raspberry Falls, was in its final stages of construction at the time of the explosion.  (Tr. at 19).

In constructing the houses of Raspberry Falls, VRC engaged Wittman Mechanical to provide heating, ventilating and air conditioning ("HVAC") services.  VRC engaged Peed Plumbing ("Peed") to install all piping, including the gas piping leading to and running inside the house.  Peed obtained a Loudoun County gas permit to perform its work and was generally responsible for running and connecting the gas piping to the appliances in the house.

Once it had installed the gas piping, Peed requested that

---

[1]Because the Court grants St. Paul's Rule 50 motion, the Court will state the facts, and the inferences reasonably drawn from those facts, in the light most favorable to Wittman Mechanical.  See Babcock v. BellSouth Adver. & Publ'g Corp., 348 F.3d 73, 76 (4th Cir. 2003); Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644-45 (4th Cir. 2002); Baynard v. Malone, 268 F.3d 228, 234-235 (4th Cir. 2001); Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998); O'Neal v. Celanese, Corp., 10 F.3d 249, 250-51 (4th Cir. 1993); Mays v. Pioneer Lumber Corp., 502 F.2d 106, 107 (4th Cir. 1974).

Loudoun County perform a combination inspection of the drain, water, and gas pipes. Before it will conduct such an inspection, Loudoun County requires that all the gas pipes in the house be tied to an appliance, capped off, or have a shutoff valve. The county inspection consists of a pressure test to detect any leaks in the gas piping. Specified amounts of air pressure are injected into the pipes. If the pipes hold the pressure for an entire day, the gas piping system is approved.

Loudoun County approved the gas piping in the house after conducting a combination inspection on October 14, 2003. (Tr. at 150). Typically, one to six months may elapse between the County administered pressure test and activation of the propane gas line. (Tr. at 176). In the case of the Raspberry Falls house, the interim period was approximately three months. During this time, a gas spur line running from the main line in the basement to an island cooktop in the kitchen became disconnected. Peed was scheduled to install the fixtures in the house (including the kitchen stove) on the day of the explosion, and likely would have discovered the open joint in the course of its installation.

Two Wittman Mechanical employees, Robert Casteel and Lloyd Henry Dignazio, Jr., reached the Raspberry Falls house before the Peed technicians arrived. Casteel served as the lead service technician for Wittman Mechanical and was generally responsible for installing thermostats and activating the heating and air-

3

conditioning units.  Dignazio served as Casteel's assistant.
Neither man held any licenses or certifications to perform HVAC
work.  Their only qualifications came from on-the-job training.

Casteel and Dignazio were sent to the house on the day of
the explosion to set outside brackets for the air conditioning
units.  They did not intend to start the furnace or turn on the
gas. (Tr. at 427).  However, Russell Rolle, the construction
superintendent for VRC, approached Casteel soon after he arrived
at the house and asked him to start the furnace.  (Tr. at 429-
30).  Rolle informed Casteel that the gas piping in the house had
passed the appropriate inspections.  Casteel never inquired into
the types of inspections or tests that had been performed.  (Tr.
at 415).

Because Casteel was not scheduled to start the furnace that
day, he obtained permission to do so by calling Wittman
Mechanical's main office.  (Tr. at 430).  Casteel then opened the
connection between the furnace and the propane gas line to bleed
out any air that would prevent the furnace from starting.  He
immediately determined that the gas line had not been activated
because he felt no pressure and smelled no gas.  (Tr. at 431).
Upon being informed of this fact, Rolle advised Casteel that the
propane tank was filled with gas and requested that Casteel
activate the propane gas line leading from the tank to the house.

Casteel once again called Wittman Mechanical's main office, this time seeking permission to activate the propane gas line. Wittman Mechanical's operations manager, Thomas Hoffmaster, gave his consent after being informed of Rolle's representation that the gas piping system was ready to receive propane gas. Hoffmaster assumed that Rolle was accepting responsibility for any adverse consequences that might arise from the introduction of propane gas into the pipes. Hoffmaster based his assumption on the facts that Rolle made the request and affirmed that the gas piping was in good condition. (Tr. at 492).

Casteel had never worked on the gas piping in this particular house and did not know personally whether the piping had been tested for leaks or other damage. (Tr. at 433). While Casteel had started furnaces before, he had never before activated the main gas line to a house. Casteel did not advise Rolle of his inexperience or lack of training. (Tr. at 433-34).

Before turning on the gas, Casteel walked around to visually inspect the gas appliances on the first floor and in the basement and confirm that the gas line valves on each appliance were in the "off" position. Casteel sent his assistant, Dignazio, to inspect the appliances on the second floor and the attic.

Casteel checked the island cooktop in the kitchen. He looked inside the island's cabinet and saw that the gas line valve was in the "off" position, but he did not touch the pipe.

5

Dignazio also confirmed that this gas line valve was in the "off" position, but could not recall whether the pipe was capped.

Casteel entered the basement and walked underneath the area in the kitchen where the island was located. Although the connection from the main gas pipe in the basement to the spur gas pipe under the island was visible, Casteel failed to inspect it. Subsequent investigation established that the gas leak that caused the explosion occurred at this point.

Casteel then activated the propane gas line and started the Carrier furnace in the basement. He did not have the Carrier installation and start-up instructions manual with him that day. In the course of turning on the gas and starting the furnace, Casteel did not perform a leak test. He acknowledged at trial that a leak test was necessary, but testified that he did not know who should perform it, how long it would take, or the equipment necessary to perform such a test. (Tr. at 408-09). Moreover, he was not aware of any codes or industry standards that he was required to follow before or after turning on the gas and starting the furnace. Casteel admitted at trial that Wittman Mechanical had never instructed him on any such codes or standards.

After Casteel turned on the furnace, he allowed it to cycle for about fifteen minutes while he cleaned up his tools outside the house. (Tr. at 441). Afterwards, he went back inside the

house, turned the thermostat down to approximately 45 degrees, and left the property.

B.   <u>Source of the Explosion</u>

Plaintiff's experts, fire investigator David M. Hoffman and forensic and mechanical engineer Peter E. Susey, visited the destroyed house on January 14, 2004, two days after the explosion.  Based on analyses of the explosion and fire patterns in the house, both experts concluded that the fire originated in the basement in an area beneath the kitchen island.[2]  The most severe damage from the fire occurred in this area.  (Tr. at 288).  The source of fuel for the explosion was propane gas that escaped from an open gas line that terminated at an elbow seven inches beneath the kitchen floor.  (Tr. at 261, 288-91).  Because propane gas is heavier than air, the propane gas that escaped from the open connection immediately sank and accumulated in the basement.  The furnace provided the source of ignition for the explosion and fire.

Plaintiff's experts further opined that if Wittman Mechanical's workers had performed a leak test immediately before

_____

[2]Defendant did not introduce any expert testimony about the cause of the fire.  Defense counsel argued to the jury in closing that the propane salamander heaters used by carpet installers who were also working in the house might have served as the source of the propane leak.  However, defendant did not offer any evidence to support this speculation.  (Tr. at 544-45).

starting the furnace, they would have detected a gas leak of this
magnitude.  (Tr. at 335).  Standard operating procedure dictates
that Wittman Mechanical's workers would then have turned off the
entire system and isolated the leak to repair it before
proceeding further.  (Tr. at 335).

## II.  Analysis

### A.   The Rule 50 Standard

Judgment as a matter of law is proper when there is "no
legally sufficient evidentiary basis for a reasonable jury to
find for the [non-moving] party on [the] issue."  Fed. R. Civ. P.
50(a)(1); see Babcock v. BellSouth Adver. & Publ'g Corp., 348
F.3d 73, 76 (4th Cir. 2003); Dennis v. Columbia Colleton Med.
Ctr., Inc., 290 F.3d 639, 645 (4th Cir. 2002); Baynard v. Malone,
268 F.3d 228, 234 (4th Cir. 2001).  The Court must view the
entire record and should grant such judgment if "substantial
evidence does not support the jury's findings."  Konkel v. Bob
Evans Farms Inc., 165 F.3d 275, 279 (4th Cir. 1999); see also
Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150
(2000) ("[I]n entertaining a motion for judgment as a matter of
law, the court should review all of the evidence in the
record.").  "Substantial evidence" is "evidence of such quality
and weight that reasonable and fair-minded men in the exercise of
impartial judgment could reasonably return a verdict for the

nonmoving party." <u>Martin v. Cavalier Hotel Corp.</u>, 48 F.3d 1343, 1350 (4th Cir. 1995).

The Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in his or her favor without weighing the evidence or considering the witnesses' credibility. <u>Baynard</u>, 268 F.3d at 235 (citing <u>Sales v. Grant</u>, 158 F.3d 768, 775 (4th Cir. 1998)); <u>Konkel</u>, 165 F.3d at 279; <u>Cline v. Wal-Mart Stores, Inc.</u>, 144 F.3d 294, 301 (4th Cir. 1998). Judgment as a matter of law must be granted if the evidence "supports only one reasonable conclusion to the verdict" under the governing law. <u>Bank of Montreal v. Signet Bank</u>, 193 F.3d 818, 831 (4th Cir. 1999); <u>see also</u> <u>Sales v. Grant</u>, 158 F.3d 768, 775 (4th Cir. 1998); <u>Shetterly v. Raymark Indus., Inc.</u>, 117 F.3d 776, 781 (4th Cir. 1997).


B.   <u>Breach of Express Warranty</u>

In its contract with VRC, Wittman Mechanical expressly warranted the following:

> 2.   <u>Contractor's Qualifications</u>.  <u>You represent and warrant to us that</u>: (a) You are experienced and skilled in the type of work which you have agreed to perform hereunder; . . . (c) <u>You are knowledgeable (and will be knowledgeable of all changes which may occur while this Agreement is in effect)</u> of all laws, regulations, specifications, <u>building, fire and safety codes</u>, permits, ordinances, minimum standards (FHA/VA, if applicable), and other requirements of any Governmental Authorities <u>applicable to the Work being performed hereunder</u>, including those set forth in paragraph 16 herein (collectively, the "Governmental Requirements");

(d) <u>You are knowledgeable of the manufacturer's</u>
<u>specifications and/or installation requirements of each</u>
<u>Material that is supplied and/or installed by you</u>;
(e) <u>All Work performed hereunder shall be performed</u> by
duly qualified and, if required by the applicable
Governmental Authorities, licensed employees,
representatives, agents, suppliers and subcontractors
(collectively, the "workmen"), <u>in accordance with the</u>
<u>highest standards of quality, care, and workmanship in</u>
<u>the industry</u>; . . . .

7.   <u>Materials and Equipment</u>.

(a) <u>Provided by Contractor</u>. . . . <u>You warrant and</u>
<u>guarantee to Us that all Materials furnished by You</u>
will be new (unless otherwise specified), of good
quality, free of all liens, security interests, claims
or encumbrances and will be installed in accordance
with the manufacturer's and/or Governmental
Authorities' specifications.

8.   <u>Warranties</u>.  <u>You warrant and guarantee to Us that</u>
<u>the Materials furnished and the work performed under</u>
<u>this Agreement shall be: (a) of good quality; (b) free</u>
<u>of defects in Materials and workmanship; (c)</u>
<u>constructed according to sound engineering standards</u>
<u>and the highest standards of quality, care and</u>
<u>workmanship in Your trade</u>; . . . .

(Pl. Ex. 48 at p. 1, 3, 4)(emphasis added).  St. Paul contends

that Wittman Mechanical breached these express warranties as a

matter of law when it failed to conduct a leak test before and/or

after starting the furnace.[3]

_____

[3]St. Paul also contends that Wittman Mechanical breached the
express warranties quoted above when it failed to conduct a leak
test before and/or after activating the propane gas line.
However, the contract between VRC and Wittman Mechanical does not
unambiguously cover propane gas piping and installation.  While
St. Paul introduced evidence at trial that Wittman Mechanical
often activated gas lines at VRC projects, Wittman Mechanical
introduced evidence to the contrary.  The jury was entitled to
believe Wittman Mechanical's witnesses and find that defendant
did not warrant any gas piping work.

The Carrier installation and start-up manual indicates that the first step for safety is to follow the 2002 National Fuel Gas Code ("NFGC") in addition to all other local codes.[4] (Pl. Ex. 94 at p. 4). The 2002 National Fuel Gas Code specifies:

**7.2.1 Test Gases.** Leak checks using fuel gas shall be permitted in piping systems that have been pressure tested in accordance with Section 7.1.

**7.2.2 Before Turning Gas On.** Before gas is introduced into a system of new gas piping, the entire system shall be inspected to determine that there are no open fittings or ends and that all valves at unused outlets are closed and plugged or capped.

**7.2.3 Test for Leakage.** Immediately after the gas is turned on into a new system or into a system that has been initially restored after an interruption of service, the piping system shall be tested for leakage. Where leakage is indicated, the gas supply shall be shut off until the necessary repairs have been made.

(Pl. Ex. 18 at p. 26). The NFGC further specifies that either a pressure test or soap-and-water test is appropriate for checking gas leakage. (Pl. Ex. 18 at p. 25). Both of these tests are commonly referred to as "leak tests."

The Carrier furnace manual contains a second set of instructions; these pertain to furnace start-up procedures. A box entitled "WARNING" appears in these instructions and states

---

[4]The President of Wittman Mechanical, John J. Wittman, asserted at trial that the 1992 version of the National Fuel Gas Code governed its workmen's duties on the day of the explosion. (Tr. at 329). The 1992 version of the NFGC essentially contains the same instructions as the 2002 version. (Pl. Ex. 18(A) at p. 24-25). This version of the NFGC also describes the same leak tests as the 2002 version. (Pl. Ex. 18(A) at p. 24).

the following:

> Never purge a gas line into a combustion chamber.
> Never use matches, candles, flame or other sources of
> ignition for the purpose of checking leakage.  Use a
> soap-and-water solution to check for leakage.  Failure
> to follow this warning can cause fire, explosion,
> personal injury, or death.

(Pl. Ex. 94 at p. 23).  Next, the Manual specifies:

> 1.  Purge gas lines after all connections have been
>     made.
>
> 2.  Check gas lines for leaks.

(Pl. Ex. 94 at p. 23).

Wittman Mechanical warranted that it would follow all
applicable codes and manufacturer specifications.  Despite the
mandatory procedures outlined above, it is undisputed that
Wittman Mechanical's workmen failed to perform leak tests before
or after starting the furnace.[5]  The Court **HOLDS** as a matter of
law that Wittman Mechanical breached the express warranties
contained in the contract by failing to follow the practices and
standards referenced in the contract and specified in the Carrier
installation manual and the National Fuel Gas Code.  Failure to
honor an express warranty constitutes a breach of contract.  E.I.
Du Pont Nemours & Co. v. Universal Prods. Corp., 191 Va. 525,
565-71, 62 S.E.2d 233, 251-55 (1950); Mason v. Chappell, 56 Va.

---

[5]Even Wittman Mechanical's President agreed at trial that
"it would be good practice for [his] men to follow the
manufacturer's instructions that come with the appliances they
install."  (Tr. At 541).

(15 Gratt.) 572, 579 (1860).  Had Wittman Mechanical's workmen

followed these practices -- specifically, conducting a leak test

-- they would have discovered the leak and thus have avoided the

explosion.

Wittman Mechanical's principal defense[6] is that VRC's

superintendent (Russell Rolle) effectively caused the explosion

by inaccurately advising Casteel that the gas piping system was

in good condition and ready to receive propane.  Assuming, as we

must, that this is true, Rolle's inaccurate representation does

not excuse Wittman Mechanical's failure to follow the leak test

procedures mandated by the Carrier furnace manual.  "[B]ecause an

express warranty is a creature of contract, the buyer may

generally enforce it even though he or she has failed to exercise

reasonable care . . . ."  18 Richard A. Lord, <u>Williston on

Contracts</u>, § 52:45, at 264-65 (4th ed. 2001).  Stated

alternatively, the affirmative defenses of contributory or

comparative negligence will not bar a breach of warranty claim.

<u>Brown v. Chapman</u>, 304 F.2d 149, 153 (9th Cir. 1962)

("[C]ontributory negligence is not a defense to breach of

_____

[6]Wittman Mechanical also defends its employees' actions by
claiming for the first time during oral argument on the Rule 50
motion that the Carrier furnace manual required testing only of
the spur line running from the main gas line to the furnace,
rather than testing the entire gas system in the house.  The
Carrier manual draws no such distinction, and Wittman Mechanical
introduced no evidence to support its after-the-fact
interpretation of the manual.

warranty where it serves simply to put the warranty to the test."); Hansen v. Firestone Tire & Rubber Co., 276 F.2d 254, 258 (6th Cir. 1960) ("Negligence on the part of the buyer [will] not operate as a defense to the breach of warranty."); Shaffer v. Debbas, 21 Cal. Rptr. 2d 110, 114 (Cal. Ct. App. 1993) ("[C]omparative negligence is not a defense to a breach of express warranty action."); Hensley v. Sherman Car Wash Equip. Co., 520 P.2d 146, 148 (Colo. Ct. App. 1974) ("[T]he concept of contributory negligence, as it is known in negligence case law and as distinct from the doctrine of assumption of risk, has no place in actions premised on breach of warranty."); Bahlman v. Hudson Motor Car Co., 288 N.W. 309, 311 (Mich. 1939).  Thus, VRC's defaults, if any, do not bar its warranty claim.

### C.   Negligence

Alternatively, St. Paul contends that Wittman Mechanical was negligent in turning on the gas and starting the furnace without conducting a leak test.  Defendant counters that Peed Plumbing was the contractor responsible for turning on the gas and checking the gas piping for leaks.  Wittman Mechanical therefore asserts that it owed VRC no legal duty.  See Blue Ridge Serv. Corp. v. Saxon Shoes, Inc., 271 Va. 206, 218, 624 S.E.2d 55, 62 (2006) (Actionable negligence requires "a legal duty on the part of the defendant, breach of that duty, and a showing that such

breach was the proximate cause of injury, resulting in damage to the plaintiff.").

Wittman Mechanical's defense on the issue of duty ignores established Virginia law.  Virginia recognizes the "ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all."[7] Didato, 262 Va. at 628, 585 S.E.2d at 48 (Va. 2001) (quoting Nolde Bros. v. Wray, 221 Va. 25, 28, 266 S.E.2d 882, 884 (1980)).  Because Wittman Mechanical accepted the additional task of turning on the gas, it assumed the duty of acting with reasonable care in performing that task.

That Wittman Mechanical was negligent as a matter of law does not mean the Court can enter judgment in St. Paul's favor. Wittman Mechanical asserted the affirmative defense of

_____

[7]The Supreme Court of Virginia noted that this legal principle is also embodied in the Restatement (Second) of Torts § 323:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> > (a) his failure to exercise such care increases the risk of such harm, or
> >
> > (b) the harm is suffered because of the other's reliance upon the undertaking.

Didato, 262 at 628-29, 585 S.E.2d at 48.

contributory negligence, and that defense still must be considered by a jury.  Jenkins v. Pyles, 269 Va. 383, 388-89, 611 S.E.2d 404, 407 (2005) (citing Sawyer v. Comerci, 264 Va. 68, 74, 563 S.E.2d 748, 752 (2002)).  The only relief that the Court could provide at this juncture would be a new trial.  Fed. R. Civ. P. 59.  Such a trial is unnecessary, however, in light of the Court's ruling on the breach of express warranty claim.

### III.  Conclusion

For the reasons stated above, the Court **GRANTS** plaintiff's motion for judgment pursuant to Fed. R. Civ. P. 50.

The Clerk is **DIRECTED** to enter judgment against Wittman Mechanical and in favor of St. Paul in the principal amount of $445,685.00, which is the sum that St. Paul claimed on the proof of loss and subrogation receipt introduced at trial.  (Pl. Ex. 55 at p. 4).  Prejudgment interest shall run at the statutory rate of nine percent from January 12, 2004.[8]  The Clerk is further **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

---

[8]Although the current statutory rate is six percent, Va. Code Ann. §§ 6.01-330.54 & 8.01-382 (2006), the rate at the time of the accident was nine percent.  Va. Code Ann. §§ 6.01-330.54 & 8.01-382 (2003).  The amended interest rate of six percent does not apply retrospectively because it would "materially change the substantive rights of a party (as distinguished from the procedural aspects of the remedy)."  Va. Code Ann. § 8.01-1(i).

**IT IS SO ORDERED.**

Walter D. Kelley, Jr.
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 16, 2006

17

8/17/06 - copies mailed cnsl. RDL